BENJAMIN T. MULFORD, appellant, and JONATHAN BOWEN and others, respondents.

On a sale of land by A. and B., administrators, under an order of the Orphan's Court, the property was struck off to C., who, on the same day on which the property was conveyed to him, conveyed it to A. The heirs brought ejectment against A.; and, on a bill exhibited by him, an injunction restraining the ejectment was allowed. On answer and testimony, the injunction was dissolved by the Chancellor. On appeal, the order dissolving the injunction was reversed.

On the 4th February, 1848, Benjamin T. Mulford exhibited his bill in the Court of Chancery, stating, that Mason Mulford, late of Cumberland County, died, intestate, on the 1st of September, 1836, seized, among other lands, of a certain farm in the township of Hopewell, in said County, which, with his said other lands, descended, equally, to his five children then living and the only child of a deceased daughter, (naming the heirs.)

That, on the 11th September, 1836, administration of the personal estate of the intestate was granted to John T. Mulford and the complainant, the only sons of the intestate; and that, on the 19th September, 1836, the said Administrators filed in the Surrogate's office an inventory of said personal estate, appraised at $1,472.65.

That the said Administrators, discovering that the personal estate of the intestate was insufficient to pay his debts, applied to the Orphan's Court (&c.); and that the said Court, in November, 1836, made an order that the said Administrators should sell the said farm, called the " Homestead farm," and containing about 69 acres of arable land, to satisfy the residue of the debts.

That, having duly advertised the said farm, the said Administrators, on the 20th February, 1837, at a public sale, and in a fair and open manner, sold the said farm to one Isaac Mulford, for $1,800, clear of the right of dower thereon of the widow of said intestate, with the understanding and agreement, that one-

third of the said purchase money should be put out at interest for the said widow during her life; and that the said Administrators, by deed dated March 21, 1837, conveyed the said farm to the said Isaac Mulford; and, on the same day, he, the said Isaac, with his wife, by their deed of that date, conveyed the said farm to the complainant, in consideration of the sum of $1,800.

That the said sale by the Administrators was *bona fide,* and for the best consideration that the said farm could be made to produce; and that the subsequent sale by the said Isaac and his wife to the complainant was also *bona fide,* and was brought about, immediately after the said sale to the said Isaac, in this wise, and not by or through any fraudulent or corrupt agreements previously entered into between the complainant and the said Isaac; that, on the same day on which the said farm was exposed to sale by the said Administrators, and just before the sale commenced, the complainant told the said Isaac, if he would buy said farm, that he, the complainant, would give him $1,800 for it; that the said farm was cried off to the said Isaac, as the highest bidder, for the said sum of $1,800; and the said Isaac, afterwards and before the day appointed by the conditions of sale for the delivery of the deed to him, consulted and agreed to let the complainant have the said farm; (it being the homestead farm of the complainant's said father, and for that reason desirable to the complainant,) at the same time at which it had been struck off; and afterwards, on the same day on which the said deed to the said Isaac was executed, he and his wife executed their deed to the complainant as aforesaid.

That, at the time of said sale, the said farm was greatly out of order, poor, and in a low state of cultivation; the fences were generally decayed and out of repair, and the dwelling house and other buildings thereon were very poor and dilapidated; and $1,800 was the full price or value of the said farm, and as much as the said Administrators, after fully and fairly advertising the same, could obtain for it.

That, between the day on which the said farm was struck off to the said Isaac and the day on which the said deeds were exe-

cuted, the said heirs of Mason Mulford, deceased, (all of whom were of full age except the said Sarah Veal,) were made fully acquainted with, and had information and knowledge that the said Isaac had agreed to sell or let the complainant have said farm as aforesaid; and, so far as the complainant knows and believes, no dissent or disapprobation was either felt or expressed by any of said heirs at the complainant's taking said farm as aforesaid; and the said conveyance thereof was made to the complainant with their full knowledge and consent.

That, after filing said inventory of the personal estate of the intestate, the said Administrators, by sale and otherwise, converted the same into cash.

That the whole personal estate amounted to $2,046.06; while the debts, with the expenses of administration, amounted to $3,692.67, as by the final account of the Administrators, confirmed by the Orphan's Court, in June, 1838, will appear.

That, in consequence of the complainant's taking a conveyance of the said farm on the same day (&c.), the said Isaac actually paid no part of the said purchase money, but the complainant assumed the payment thereof; $1,200 of which the complainant paid by paying debts, to that amount, of the said intestate, and which, as the complainant is advised and insists, were, at the time of executing the said conveyances, liens and incumbrances upon the said farm; and the remaining $600 the complainant secured by bond, and paid the interest thereof to the said widow, during her life, in lieu of her right of dower in said farm; and at her decease, on the 24th March, 1842, or shortly after, the complainant paid four fifth parts of said $600 to and for the use of the said heirs, as follows: $120 to Phebe Maul; $120 to John S. Mulford; $120 to Jonathan Bowen, husband of Maria, and $120 to David Minch, surviving husband of Priscilla, and the father and guardian of her children; and the complainant retained the remaining fifth part for his own use, as one of the heirs. That the said principal sum was divided into five parts, instead of six, in consequence of the said Sarah Veal having died, intestate, and without issue, before the death of the said widow.

That when the complainant paid the said sums of $120 to the said David Minch and Jonathan Brown, respectively, they had full knowledge that the said farm had been conveyed to the complainant as aforesaid ; and they, severally, accepted and received the said sum of $120 as part of the said purchase money thereof.

That, from the time of the said conveyance to the complainant to the time of the commencing of the ejectment hereinafter stated, the complainant, with a full knowledge of all the circum stances as hereinbefore stated on the part of the said David Minch and Jonathan Bowen and his wife, had quiet possession of said farm, without any claim of right or title thereto by the said Minch and Bowen and his wife ; and, with their full knowledge, the complainant expended, in cultivating and manuring said farm, and in building, repairing and enlarging the buildings thereon, and in fencing and other permanent improvements, large sums of money, amounting, in the whole, as nearly as he can state, to about $5,000 ; raising said farm thereby from the poor and dilapidated condition aforesaid to a high state of cultivation, with good and permanent buildings and improvements thereon, and worth nearly four times as much as when he purchased it as aforesaid.

The bill then states, that the said Minch, claiming one-sixth of the said farm as tenant by the courtésy, and the said Jonathan Bowen and Maria, his wife, claiming one-sixth of said farm, and claiming that the said convéyance to the complainant is void in law, have brought ejectment (&c.), in the Supreme Court, by declaration returnable to July term, 1847, against the complainant ; and that the said suit is noticed for trial at the next Cumberland Circuit.

That the said Isaac Mulford was the only person by whom the complainant could prove the exact circumstances under which the complainant purchased and had said farm conveyed to him as aforesaid, and that the said Isaac has been dead some 6 or 7 years.

That the complainant is advised that, although the said sale and conveyance to him is valid in law and equity if the precise

circumstances touching the same as aforesaid could be proved in a court of law, yet that, by reason of the death of said Isaac, and the fact, to be left unexplained thereby, of the said conveyance to the complainant bearing date on the same day with the said conveyance by the said Administrators to the said Isaac, and under some peculiar decisions of our Supreme Court in allowing mere equitable frauds to be proved to invalidate a deed on a trial at law, he cannot safely, nor without great hazard, defend his title to the said farm in the trial of the said ejectment; and that his proper redress is in this Court.

The prayer is, that the said ejectment may be restrained by injunction; and that the said Minch and Bowen and wife may be decreed to confirm the title of the complainant to said farm; or, if the Court shall be of opinion that the title of the complainant is voidable in equity, then that said Minch and Bowen and wife may be decreed to come to a just and equitable account with the complainant in the premises; and that the complainant may be placed in the stead of the several creditors of the said intestate, and have a lien upon the said farm for the amount of the said debt, and interest thereon, and monies paid to said Minch and Bowen and other heirs, and interest thereon, and for the amount of all the permanent repairs and improvements of said farm as aforesaid, over and above the rents, issues and profits thereof, according to its condition at the time of the said conveyance to the complainant; and for such other and further relief, &c.

An injunction pursuant to the prayer of the bill was allowed.

Bowen and Minch put in separate answers.

Bowen, in his answer, says, that at the time of the said sale, and for some years before, he resided in Louisiana, and that he did not return to this State until some time after the sale.

That he is informed and believes, that no such deeds as are mentioned in the bill are on record in the Clerk's office.

He denies that the said sale and conveyances, if any such con-

veyances were made, were *bona fide* and for the best consid-
eration the said farm could be made to produce ; and insists that
the said sale was fraudulently made ; and that the said Isaac.
Mulford was, by the said complainant, by and through a fraudu-
lent and corrupt agreement entered into by and between the
complainant and the said Isaac prior to the sale, procured to
bid off said farm for the complainant ; so that the same was in
fact bid off and bought by the complainant himself, at his own
sale, corruptly, and contrary to his duty as one of said Admin-
istrators ; by 'reason whereof this defendant submits that the
said sale was void.

He denies that $1,800 was, at the time of said sale, a fair
price for the said farm ; and says that the farm was then worth
$3,000, and would, if fairly sold, have brought a much larger
sum than $1,800.

He says he has been informed and believes, that the complain-
ant, intending, through his agent, the said Isaac Mulford, to
buy the said farm for his own use, for the purpose of enabling
him to buy the same below its fair value, corruptly and con-
trary to his duty as Administrator, took measures to depreciate
the property and prevent its, bringing a fair price, by giving
out, and procuring his mother, the said widow, to give out, that
she would not release her right of dower unless the complainant
should get the property, and by leaving it a matter of doubt, at
the sale, whether it was sold clear of her dower, and by refusing
to show the premises to persons who were desirous of purchasing
and applied to him to show the same, and by giving out and
circulating a report, at the sale, that he would not give up the
possession to the person who might purchase the farm, and that
they would have to bring an action to recover the possession, and
by other fraudulent and corrupt practices.

He denies that he was, at the time the said deeds are stated
by the complainant to have been made, or at any previous time,
made fully acquainted with and had information or knowledge
that the said Isaac Mulford had agreed to sell or let complainant
have said farm ; and denies that the said conveyance from the
Administrators to the said Isaac, and from the said Isaac to the

complainant, were made with his knowledge and consent; and says that he was absent from the state (as above stated); and had no knowledge of the sale and conveyance, or of the circumstances attending the sale, or of the making of the deeds, or any information respecting the same. And says, that he never gave any consent, directly or indirectly, to the purchase of the said farm by the complainant for $1,800, or to the making of any conveyance thereof to him, if any such conveyance has ever been executed.

He denies that on the decease of the widow, on the 24th of March, 1842, or shortly after, the complainant paid him one-fifth part of the said sum of $600, or at any other time or in any other manner; and denies any agreement made or entered into, or any consideration whatever being given to him, after or before the decease of the said widow, on account of said purchase money for said farm, or his consenting to the said sale in any manner.

He denies, that with a full knowledge on his part of all the circumstances stated by the complainant, the complainant had quiet possession of said farm without any claim of right or title thereto by this defendant or the other heirs; and says, that, on the contrary, he always denied the complainant's title, and, on one or more occasions, so intimated to the complainant, who, as this defendant insists, well knew, from the first, that his title was questioned, and would be investigated, and who, well knowing his own fraudulent and corrupt practices to obtain said farm, could not be ignorant of the defectiveness of his title. And he submits, that the complainant is chargeable with full knowledge of all the consequences of his illegal acts, and had no right, in law or equity, to expect or require of this defendant any warning or notice thereof.

He denies that the repairs and permanent improvements made by the complainant amount to anything like the sum he has stated; and submits, that the complainant has had the use of the farm since the sale, and that whatever improvements he has made were made voluntarily and at his own risk, without any encouragement to do so from this defendant, or, so far as he knows,

from the other defendant, and, if lost by him, will be lost by his own wrongful and fraudulent conduct.

He admits the bringing of the ejectment; and submits, that, by the well settled rules of this State the complainant has no title (&c.)

He submits, that all and every the matters in the bill mentioned and complained of are matters which may be tried and determined at law, and with respect to which the complainant is not entitled to any relief in this Court; and he prays the same benefit of this defence as if he had demurred to the bill.

The answer of Minch is the same, except that he says he was unwell at the time of the sale and did not attend it; and admits, that, sometime after the death of the widow, the complainant, in a settlement this defendant had with him about other dealings, accounted to this defendant and allowed him $120, stated by the complainant to be one-fifth of the sum included in a bond given by the complainant to the said widow for one-third of the amount for which the said Administrators had sold the said farm purchased as aforesaid by the complainant; but this defendant denies that he received the said sum under any engagement or understanding that he acquiesced in or agreed to the said sale; and he denies that he accepted the same as his share of the purchase money thereof.

Replications.

*Auley McCalley Wood*, a witness produced on the part of the defendants in the above cause, being duly sworn, deposeth and says: I was called upon by William Smith, to view the Mason Mulford property, several years ago; I cannot tell exactly when; it was after Mason Mulford's death. After we viewed the land we went to view the house; I was some acquainted with the lines; at the house we talked with the widow. The widow seemed affronted, and said if any body else than Benjamin bought, she would not sign the deed. We left the house and went up to the tavern, and saw Mr. Benjamin Mulford there.

He lived at Salem at that time. He asked me if I was going to bid at the property. I told him yes. He said his mother would not sign the deed, or he said she said she would not sign the deed, I do not remember which. I think this was the day the property was to be sold. The old gentleman, William Smith, had come down for the purpose of buying the property. I was authorized by Mr. Smith to go as high as $2,500, unless I was stopped, or could get the property for less. We did not bid in consequence of what was said about the widow's signing the deed.

Being *cross-examined*, on the part of the complainant, says: I am near seventy years old. I have been deaf more than twenty years. I do not recollect that there was any person present when the conversation happened between Benjamin T. Mulford and myself. There were other persons present at the conversation with the old lady, who interpreted what she said, otherwise I should not have known what she said. I was at that time deafer than I am now. (The witness is now so deaf that his examination cannot be conveniently taken except by written interrogatories. This is admitted by the parties.) No person told me what Benjamin said to me at the tavern. He talked to me so plainly that I was satisfied as to what he said. Mr. Thomas Smith and his father both told me what the old lady said. At the time of the sale I was not so frequently in the habit of having conversation with Benjamin as now. There was very little conversation between us. He took me out and asked questions and I answered him. He did not say that he did not want his mother to sign. The conversation between us was on the porch at the tavern.

Being again *examined* on part of defendants, says: I had a conversation with Benjamin since the subpena was served, which I commenced myself, and in it he told me that he did not say his mother would not sign, but that he said she said she would not sign.

(It is objected on part of complainant's counsel, to all that part of the above evidence relating to the conversation between witness and the widow, and the cross-examination is subject to that objection.)

*Thomas Smith*, a witness produced on the part of defendants, being duly sworn, deposeth and says : My father's name was William Smith ; he is dead. I know that my father talked of buying Mason Mulford's farm, after his death, at the time it was advertised by the administrators. I think about twelve years ago. I went with father to look at the farm ; it is in Roadstown, where Benjamin T. Mulford now lives. We went to look at the farm. We saw the old lady. Auley McWood was there. I mean by old lady the widow of Mason Mulford, and mother of Benjamin. Mrs. Mulford said she would not sign the deed if any other person than her son Benjamin bought. We went from the farm to the tavern. Neither father or I had any conversation with Benjamin that I know of. My father had spoken to Mr. Wood about buying the farm. He told him to give $2,500 if he could not get it for less. I supposed my father considered the farm worth $2,500. I did not make any calculations as to what it was worth.

Being *cross-examined* on the part of complainant, says ; I was forty years old last May. Neither myself or father had viewed the farm before that day. He then lived in Gloucester county, about twenty-five miles from Roadstown. I don't know that we walked all over the farm on that day. I did not know anything about the lines. Mr. Wood, father and myself were together. We went to Wood's house after him. When father told Mr. Wood to give $2,500 for the farm, we were at Mr. Wood's house. This was before we had been on the farm. We reached Mr. Wood's in the forenoon. I dont think we were on the place more than three-quarters of an hour. The house was not in as good condition as we expected to find it. I don't know but what we found the fencing in as good condition as we expected to find it. Father has been dead nine years last Sep-

tember. The old lady was alone when we had the conversation with her. I don't know the age of the old lady; she appeared to be an elderly woman.

Being again *examined* on part of defendants, says: I was present at the sale. Mr. Wood did not bid for my father. My father told me when we were going home, the reason he did not bid or buy the farm was, because the widow would not sign the deed.

(Complainant's counsel objected to the whole of the testimony, and cross-examination was made subject to this exception.)

*Henry Dowdney*, a witness produced on part of defendants, being duly sworn, deposeth and says: I was present at the sale of Mason Mulford's property, about twelve years ago. I think the farm was bid off near the farm. The farm house is about one hundred and fifty yards from the tavern. I am not positive where it was bid off. I do not recollect the conversation between Benjamin T. Mulford and myself; it seems like a dream to me. My recollection is too indistinct to be qualified about it. I think Benjamin Mulford come to me and asked me to bid on the property, that it was going for less money than he was willing to give for it. I did bid for it, and think he said he was willing to give $1,800, and it was going for less than that. It was bid off to Isaac Mulford.

Being *cross-examined* on part of complainant, says: I think there was a conversation between me and Mr. Mulford, but as to wording it I cannot. I told Mr. Mulford some three or four years ago that I did not recollect of bidding for the property. Since then I have had a conversation with John S. Mulford, and it is that conversation which has brought this recollection to my mind. I do not know who kept the tavern at that time. It strikes me that Mr. Mulford said the farm was going for less than he was willing to give for it.

47

Being again *examined-in-chief*, says : My telling Mr. Mulford that I did not bid on the farm, arose in consequence of Mulford's talking to me about a suit respecting the property. Says he, you bid on the farm ; says I, I didn't : he says, I think you did. That was all that passed at the time. I think this was since the suit about the farm. Mr. Mulford was at my house last evening ; we were talking about the sale of the property and about my bidding on it, he said the property was set up at $1600, and he asked me to bid on it, and then I bid $50 ; then Mulford made another bid ; and then I bid $50 more, and Mulford bid $50 more, and the property was knocked off at $1,800. He said he had told Mr. Mulford that he would give $1,800 for the property, and that if it was bid off for less he would have to give Mr. Isaac Mulford the difference, and that he would rather it would go in the family.

*Joseph Harris*, a witness produced on the part of defendants, being duly sworn deposeth and says : I am thirty-five years old this coming May. I remember hearing of the sale of the Mulford farm. I lived at that time, either with Isaac Mulford, my grandfather, or in the house opposite his. Benjamin T. Mulford come to see grandfather ; their conversation was about the home property of Mason Mulford. Benjamin wished it not to go out of the hands of the family. He made some remark about the children, but I do not remember what it was ; in substance that they would not get the property. I was going about my work and do not remember exactly. He mentioned John S. Mulford's name. I think this was a few days before the sale ; a week, or it might be two weeks. I did not hear all the conversation between them. After that, Benjamin's horse stood at the hitching post of Isaac Mulford's house, between the time of the above conversation and the sale. I was at the house opposite, which my grandfather repaired for me, and where I lived at the time, or did live afterwards. I started across the road to grandfather's, and as I went over he and Benjamin come out of the house. Benjamin passed to his house, and as he passed said, I shall depend on you to bid off the property, and grandfather told him he would ; that is the substance of what I heard at that

time. This was only a day or two before the sale; may have been the same day, can't say as to that. Some length of time after that, Benjamin came there again; Benjamin and grandfather were in the kitchen together. I went to the door and heard Benjamin's voice; I did not hear what he said. I passed immediately in, and only heard grandfather's reply; grandfather stood on the floor with a paper in his hand, and says, no sir, you can't have that writing; if you wish it you can have a copy, but that piece of paper can never go out of my hands; I think he said, while she lives. I bought that property for you, and I would not willingly see her taken the advantage of. I don't recollect that Benjamin made a reply, but he drew up the table and took a copy.

Being *cross-examined*, says: Grandfather has been dead eight years this spring. He was one of the commissioners to divide the estate of Mason Mulford, deceased. The first conversation was out near the wagon house. I cannot say what I was doing. I was near grandfather when Benjamin came up. I do not recollect what I had been doing before that, nor what I went at afterwards. I have had nothing to call my attention to this conversation until a subpœna was served on me about a year ago. I do not know that I can recollect any one thing that was said by my grandfather or Benjamin at that time. I have said the conversation was about the home place, but cannot give the words. I don't know what time in the day it was. I stopped when I met grandfather and Benjamin at the second conversation. Benjamin went immediately away after saying I will depend on you to bid off the farm. My father's property and Benjamin Mulford's join; there has been a dispute about the lines; I should think so from the mad-lane between them. I have not taken part with David Minch and Jonathan Bowen in the prosecution of their suits, and have not promised to pay a part of the expenses. *Question.* Is there a kind feeling between you and Benjamin T. Mulford? There is; he has taken the advantage of me two or three times, and I want no more dealings with him. I think my attention has not been called to

any of these conversations, until about a year ago. I was not at the sale.

・ Being *examined in chief*, says ; I had a conversation with Benjamin Mulford this week a year ago, at Miller's hotel in Bridgeton. I had been subpœnæd as a witness between these parties, on the part of Minch. He called me out in reference to another matter, and the conversation turned on this. I asked him, why, Benjamin, did not grandfather buy that property for you? he told me he did not, but that he bought it for himself, and he, Benjamin, afterwards concluded to take it off his hands. I told him I always thought the other way, that grandfather bought it for him. With that we parted.

. *Jacob Harris*, a witness produced on the part of defendants, being duly sworn, deposeth and says ; I am fifty-eight years old this coming May. I am acquainted with the Mason Mulford home farm. I own land adjoining it ; did not own it at the time of the sale ; bought it in 1842. I heard of the sale of the Mulford farm at the time, but was not at the sale. I was acquainted with the neighborhood, but not particularly with that farm. I was acquainted with the draft and boundaries of the farm. (Between the time it was offered for sale and the sale of it I heard Isaac Mulford say, that he would give a thousand dollars more for the farm than it was bid at, but he did not want it. It was worth twice what it was bid to. Objected to.) I thought Isaac Mulford valued it higher than I considered it worth. The impression on my mind now is, that his valuation was upwards of $3,500, but I do not remember what it had been bid at. I thought at the time that $3,000 was about the worth of it, but I was not much acquainted with the value of property in that neighborhood. I understood that the farm had been put up, and was adjourned on Isaac Mulford's bid, and this conversation with him was between that adjournment and the day of sale. Isaac Mulford was my wife's father.

Being *cross-examined*. I expect I was told what the farm was

bid to, but do not remember. Isaac Mulford told me it was adjourned on his bid. I can't say for how long a time the sale was adjourned. There is a misunderstanding between Benjamin T. Mulford and myself about our lands. The result of this dispute is that he has thrown me to commons, and I have been obliged to put up my own fence. I had not walked over and viewed the farm before the conversation between Isaac Mulford and myself. I had been on it as a surveyor, and had run two or three lines on it, in surveying other property. My being on it was confined to the boundaries. I did not advise David Minch or Jonathan Bowen to commence this prosecution. To the best of my knowledge I did not advise John S. Mulford or any other person to commence a prosecution for this farm. I have said, I would bear a portion of the expense if they would commence a prosecution, but not now. It was when I owned land adjoining the farm, which I do not now own. I did at that time offer to bear a part of the expense. I promised to do it, and I considered my word an agreement. I made no other agreement. I should have done it if they had gone on with the suit.

Being again *examined in chief.* The reason I made the offer to bear a part of the expenses of the suit was, that my wife was an heir of Isaac Mulford. A few days after the death of Isaac Mulford, B. T. Mulford moved from 100 to 150 rods of fence which had been fenced as a line fence between Isaac Mulford and him, and set it from two to four rods on land that I. Mulford had had in possession all his life time, from the time he purchased it. In order to recover that land, we applied to Lucius Elmer to prosecute him. In the investigation, it was discovered that Isaac Mulford was only the bidder at that property and that Benjamin was both buyer and seller. We were advised by our attorney that that would be the easiest way to come at it, because in the deed made by Isaac Mulford to Benjamin Mulford, this strip of land was included, which was not covered by the Mason Mulford survey of the home property. The home property is now worth $4,000. It is not worth much more now han it was then, excepting the general increase of the value of

land. He has put on and taken off. I am under no obligations to pay any part of the expenses of this suit. I have nothing to do with it.

*John S. Mulford,* a witness produced on the part of the defendants, (complainant's counsel objects to the examination of said witness, he being one of the administrators of Mason Mulford.) (At the request of defendant's counsel, counsel of complainant produced a deed from the administrators of Mason Mulford to Isaac Mulford) being duly sworn, deposeth and says : I am the son of Mason Mulford, deceased, and one of the administrators of his estate. Benjamin T. Mulford was administrator with me. We sold the home place. (Being shown deed produced by complainant, dated March 1, 1837, marked *Exhibit A.*) I think this is the deed we made for the property. My name is to it. I had forgotten signing it. I was very much against the way it was sold, and paid so little attention to it after it was bid off, that I had forgotten whether I signed it or not. I do not know the handwriting in the body of the deed. I do not know the handwriting of the two interlined words, "Joseph Bacon," in the deed. Do not think they were there at the time of signing the deed. The property was not sold the first time it was set up. It was adjourned on Isaac Mulford's bid. I had it adjourned myself. I considered there was some gouging going on. It was adjourned upon the bid of $1,800. Afterwards I went to Isaac Mulford's, and called him out, and asked him if he was buying the farm for Benjamin or for himself. He said he was buying it for Benjamin. I told him it was not fetching half value. He said no ; I will give more than that myself for it. And between the day it was adjourned and the time to which it was adjourned, I heard of William Smith. I went to Thomas Smith, his son, and got him to let the old man know this farm was for sale. The day of the sale I went down to the house that is on the farm ; went into the house, and the first one almost that I saw was Benjamin. He said I had took a great deal of pains to send for Smith to come and buy the farm and run it up on him. I told him he had been gouging from the

first part of the sale to the last, and didn't pay no regard to his oath whatever. He said I was a liar, and called me several bad names, and amongst the rest shook his fist in my face. I went out of the house and went up to the tavern where the property was to be sold; the time came round, and the property was set up again. Isaac Mulford bid $1,600; it was cried a spell at that. Benjamin Mulford called Henry Dowdney out of doors. Mr. Dowdney came in presently, and bid $100 more on the property. A short time afterwards Mr. Isaac Mulford bid another $100. I called Mr. Isaac Mulford out of doors, and asked him whether he was buying this property for himself or buying it for Benjamin. He said he was buying it for Benjamin. I told him that was not according to what he told me before. He said then, he would give more for it himself: he said he would give more money for it, but Benjamin pressed him so hard to buy it for him that he could not get clear of it. I went into the house and called out William Smith. I asked him if he was not going to bid at the property. He said he had been to the house and talked with Benjamin, and he was mad, and would not show him the property. He and his son went up stairs, and looked at the house themselves, and Benjamin went out into the shed with Auley McWood; and he said further, that mother said she would not sign the deed if any body bought it but Benjamin. I insisted on his buying it, and said that mother would sign the deed, and every thing should be made right according to the advertisement, and if not that he should lose nothing by it. He went into the house; likewise I did. He would not tell me whether he would or not. Then Benjamin called me out again. He said I was trying to get the property run up on him, and swore it should not be knocked off to any but him, or to Isaac Mulford for him. I went into the house again, and spoke to several to bid, but they said there was no use, Benjamin would have the property. I think Henry J. Smalley was one of the persons I spoke to. I think his objection was, that his father-in-law, Isaac Mulford, was buying it for Benjamin, and did not want him to bid against him. I took Mr. Smith out again, and requested him for to bid on it, and asked him how much money he

was willing to pay for the property. He said he was willing to give either $2,400 or $2,500, and more to, if he could get it without a lawsuit. After going in again, Benjamin called me out again. He told me I ought to let it have been knocked off to him; that he could have it for $1,600 as well as for $1,800, if he had not got Dowdney to bid $100 on it, so as to make Isaac give another hundred. I told him it should not be knocked off at that price, no how, but if he would bid $400 more, though that was not half value, it would about pay my father's debts, and it might be knocked off to him. He swore he would not give a cent more, and it should be knocked off to him; that Plummer, the crier, would do as he said. I told him that he would do as I said, and would not knock it off to him. I was pretty much at a stand, the time was out in a few days; the court had set. I had no one to consult with, and let it go pretty much as he pleased. There is not a word I have said here but what is the truth; the whole truth to the best of my knowledge. I considered the farm at that time fairly worth $3,600 or $4,000. The property was advertised and set up to be sold clear of my mother's dower. Mother was not bound to sign that deed except her word. She never told me that she would not sign it; she always told me she would. I don't recollect that Benjamin told me that mother would not sign the deed if any body bought it but him. I don't know that she ever did sign any thing. *She told me she did not.* She never claimed any dower, except the interest of one-third the money it sold for.

This deponent, upon his *cross-examination*, further says: I was fifty-four the 10th day of September last. I reside at Roadstown. Since the death of my father I have lived five years in Roadstown and the other part in Salem. I gave to Jonathan Mulford a judgment bond in 1847. I think there was judgment entered thereon, and one-fifth of this farm levied on by Sheriff Murphy, so I understand. I did not to my knowledge direct sheriff to levy on it. He may have said something to me about it, but I do not recollect what. It seems to me he did. The consideration of the bond was $800, I think, loaned to me by

Jonathan Mulford. I used part of the money, and paid my debts with the other. I did not at that time pretend to own any other real estate than my interest in this farm. I married Jonathan Mulford's sister. My brother Benjamin and I are not on good terms, and never shall be without he makes amendments for what he has wronged me out of. We have been at variance pretty much ever since the commencement of sale of my father's property. We do not talk together when we meet. He has robbed me and cheated me so much that I do not like him, and never shall, until he makes amendments. I may have said if he had been dead years ago I should have been better off than I am now. I most think I received my share of the $600 bond given to my mother in lieu of dower. Mother lived five or six years after the sale. I didn't recollect giving a receipt for $120, my share of that bond. I may have done so. I believe there was a bond for $600 given to my mother. I always understood that that bond was given by Benjamin for her dower in the farm. (Witness being shown *Exhibit B,* on part of complainant, being a receipt from witness to Benjamin T. Mulford, for $120, dated August 2, 1842, the body of receipt being in the handwriting of Elias P. Seeley, deceased,) says the name thereto is in my handwriting. I don't ever remember to have seen the bond. Witness being shown *Exhibit C,* on part of complainant, being a bond from Benjamin T. Mulford to his mother, for $600, dated March 1, 1837, says that he subscribed his name as a witness thereto, but has no recollection thereof. I was on good terms with my brother at the death of my father. I do not contribute any thing toward the expenses of this suit. I don't know positively that David Stretch has commenced a suit for the recovery of my share of the farm sold by Sheriff Murphy. I do not recollect being at Thomas H. Dudley's office with Jonathan Mulford about such suit. There was no arrangement made with me and Jonathan Mulford at the time I gave him that bond, that he should purchase my share of the farm and commence suit to recover the same. I think I heard him say it should bring the amount of his bond, or he would purchase. I do not remember going to William Nelson and asking him to take a conveyance

from Jonathan Mulford for my share of the farm, to keep Jona-
than Mulford's creditors from getting it.   I don't recollect that
I went to Nelson particularly about the farm ; there might have
been some conversation about Jonathan Mulford's breaking, but
I can't say what it was.   I have no recollection of asking Nelson
to take a conveyance from Jonathan Mulford of that farm at all.
There might have been some conversation about it ; I do not re-
collect what it was.   I never did, to the best of my knowledge,
tell Nelson that Jonathan Mulford did not give any thing for
that farm.   I never did tell Nelson how Jonathan Mulford come
to have my share of that farm.   I don't recollect of having any
conversation with Nelson about the farm.   I have been at Dud-
ley's office for Mr. Minch.   I dont think I ever did go to Dud-
ley's office for the purpose of getting him to commence a suit for
my share of this farm.   I can't tell where I was when I gave
that bond to Jonathan Mulford.   Can't recollect whether it was
in Camden or Philadelphia.   Part of the consideration of the
bond was for an old debt, and part for money paid down.   I
can't tell what part was for the old debt.   We had dealings for
many years.

(Counsel of complainant in addition to the objection to this
witness altogether, objected to all that part of his examination
in chief relating to conversations between him and Isaac Mulford,
William Smith, Henry S. Smalley, and his mother.

*Richard Bawacliff*, of Bridgeton, a witness produced on the
part of complainant, being duly sworn, on his oath says : I am
forty-one years of age.   I moved into Roadstown in 1838, just
after the sale of Mason Mulford's farm.   David Minch, one of
the defendants in this cause, owned land adjoining the said farm.
I remember having a conversation with said Minch shortly after
the farm was purchased by Benjamin T. Mulford ; he was en-
gaged in putting up a partition fence.   We were talking about
Mulford having purchased the farm, and he found no fault,
either with Mulford's having purchased the farm or with the
price at which he bought the same.   The farm at that time was

very much out of repair; the fences generally were kept up by sassafras hedge-rows, and at the conversation above referred to, Minch told me he had sold to Mulford rails to repair the fences on said farm. The soil was in a very low state. I remarked to Minch that I thought the farm went low at the sale, and that he was able to buy the same, and might as well have done so; he replied, I don't know about that. From the reply I inferred that he thought the farm brought about what it was worth. I purchased real estate in the neighborhood of the farm about that time; real estate was then generally selling low. I paid $14 per acre. I have heard, that at the time of the sale, the widow of Mason Mulford had said that she would not sign away her right of dower in the farm, if any other person than Benjamin Mulford purchased. I never heard her say any thing about it. I have seen the same farm recently, and see it frequently. The farm is very much improved since Mulford purchased. I resided two years in Roadstown, in the years 1838 and 1839. Mulford was engaged in improving the farm by carting marl on it and repairing the fences. The buildings were very much down when I lived there, which Mulford afterwards improved. He has built a large wagon house, moved and repaired the barns, and built an addition to the house. From the improvements which he has put on the farm, and the general rise in the value of the real estate in this neighborhood, I should think it was now worth at least $5,000.

*Belford M. Bonham*, of Stone Creek, a witness produced on the part of complainant, being duly sworn, on his oath says : I am about forty years old. I am acquainted with the homestead farm of Mason Mulford, and have been since 1816. I was not present at the sale of the farm by the administrators, but understood that Isaac Mulford bid it off at the sale. At the time of the sale the farm was in a reduced state; fences out of order, and back part of the farm in a low state of cultivation; the front was in rather a better condition. Only a small part of the farm lies fronting on the road. I have but a slight recollection of the buildings, but think they were considerably out of repair. Mr.

B. T. Mulford has been improving the farm by carting on marl, gravel and manure, ever since he owned the same. · He has built a large and convenient wagon house, repaired the barns and house. On the 25th September instant, I walked all over the farm in company with Thomas Ware, Esq., and we made an estimate of what we thought the land would now bring, in the same state as it was when sold by the administrators, and also an estimate of what it would bring in its present state, and we made the difference between the two estimates, $2,175. In these estimates we did not include the buildings. Real estate in 1838 was generally selling low, and is now selling high. I should think the rise in the price of real estate between 1838 and this time is about one-half. I am engaged in surveying and conveyancing about this county, and often hear this subject talked of by persons who are buying and selling.

*Thomas Ware, Esq.*, a witness produced on the part of complainant, alleging himself conscientiously scrupulous of taking an oath, on his solemn affirmation, says : I am in the 58th year of my age. I was present at Roadstown at the sale of the Mason Mulford farm by the administrators, in the year 1837. The property was bid off by Isaac Mulford, and I supposed him to be the purchaser. I have always lived near the said farm, excepting one year. I am well acquainted with the farm. I fenced a part of it on shares before Mason Mulford's death. At the time of the sale the farm was poor, excepting five or six acres lying on both sides of the main road. The fences were generally poor, and the buildings considerably out of repair. Real estate was selling low at that time, but I thought the farm went for less than it was worth, but no one would bid more. I saw nothing about the sale but what was fair. I had heard before the sale that the widow would not release her right of dower, and supposed the farm would be sold subject to her dower, until I heard the conditions of sale read. I have not seen or heard the conditions of sale since the time of sale, but my impression is that part of the purchase money was not to be paid, but the interest secured to the widow during her life. I recollect Henry

Dowdney made two or three bids against Isaac Mulford at the sale. Do not remember that any other persons bid. There were a good many persons at the sale, which took place in the bar room of the tavern at Roadstown. I think both Benjamin and John S. Mulford were present. I had no conversation with John Mulford at the time, about the sale, nor do I remember of his being or expressing dissatisfaction about the sale. I have examined the farm recently in company with Belford M. Bonham and Hosea Moore. Mr. Bonham and myself made an estimate of what the farm would bring now, in the condition it was when sold by the administrators, and an estimate of what it would bring in its present improved condition, and the difference was $2,175. I should think if the farm should now be put in the market, in the same condition as it was in 1837, it would bring $3,500. Without taking into consideration the improvements made to the buildngs b y B. T. Muford, I should think the farm would now bring $5,675. There has been a great rise in the price of property since 1837. Some has more than doubled itself, and other has not.

*David Veal,* of Hopewell, a witness produced on the part of the complainant, being duly sworn, on his oath says : I married Nancy, one of the daughters of Mason Mulford deceased. My daughter Sarah was one of the heirs-at-law of Mason Mulford. I was not present at the sale of Mason Mulford's farm by the administrators. I thought the farm sold low, but was satisfied with the price it brought, considering the way property was then selling. Property was then selling low. I can safely say that real estate would now bring one-half or one-third more than it would then.

*John D. Hires,* of Greenwich, a witness produced on the part of complainant, being duly sworn according to law, on his oath says : I have been acquainted with the Mason Mulford farm for some years before Mason Mulford's death. I moved into Roadstown in 1838. The farm at that time was poor, the back part of it light. Benjamin T. Mulford moved on the farm in the

spring of 1839; he rented it the year previous. He was improving the property both before and after he moved on it, by putting on marl, lime, manure and guano. The buildings and fences, when I moved to Roadstown, were very poor, and not a fence that would have turned cattle had the hedge-rows been cut down. The rails were generally oak, and rotted and old. Benjamin T. Mulford built a large wagon house on the farm five or six years ago. There are two barns he moved on the farm since he purchased; he has raised the barn on the farm when he bought, six feet in height, new roofed and otherwise improved it. He has enlarged and improved the hay house. He has also added improvements to the dwelling-house. While these improvements were going on I lived in the neighborhood, and Mulford called on me to assist him. I think he has dug two new wells on the premises. At the time the farm was sold by the administrators I do not suppose it would have averaged fifteen bushels of corn to the acre; it would now bring more than fifty bushels to the acre. I have been engaged in farming for five years past, and have occasionally worked on this farm.

*Hosea Moore*, of Bridgeton, a witness produced on the part of complainant, being duly sworn according to law, on his oath says: I was one of the commissioners appointed by the Orphans' Court, of the county of Cumberland, to make division of the real estate of Mason Mulford. I think the appointment was made in the fall of 1836. In making this division we were directed by the administrators, Benjamin T. and John S. Mulford, to leave out of the division of the real estate of Mason Mulford the farm that was afterwards sold by the administrators. I am a practical surveyor, and at that time surveyed around this in order to give the courses and distances, and make out the number of acres it contained. In doing this I made myself acquainted with the situation of the farm. (Witness being shown *Exhibit* marked *No.* 1, says: this is the map of the farm made by me at that time.) About four acres lying on the Greenwich road was in a pretty good state of cultivation, and I should judge about ten acres lying on the south side of the Roadstown and Bridgeton road was in

the same state of cultivation; the balance of the farm was very poor, and the fences all around the back part of the farm were oak, and very poor. I remember going over this farm last year in company with Thomas Ware, Esq. I saw considerable improvement made in the buildings, fences and land. At least two-thirds of the farm will now produce three times as much as it would in 1836 and 1837. I mean the back part of the farm.

*George Ayars*, of Bridgeton, a witness produced on the part of complainant, being duly sworn according to law, on his oath says: I am a practical house carpenter. I was called upon by Benjamin T. Mulford, in company with David A. F. Randolph, to examine the improvements made by him on the farm where he now lives in Roadstown, formerly owned by Mason Mulford, and sold by his administrators after his death. Mr. Randolph and myself examined and estimated the improvements to the dwelling house and the outbuildings, separately, and afterwards compared our estimates together, and came within a few dollars of each other. The whole improvements amounted to about $2,200. Mr. Randolph has in his possession the estimates made at the time. According to my recollection, we estimated the improvements on the house at $800, the new wagon house at about $600, one barn at about $300, the two barns moved on the property and the hay house we estimated at about $500. These improvements have been made within a few years by Mr. Mulford.

*Hosea Moore*, being recalled on part of complainant says: The last time I was on the farm in question, my attention was called to where the fence then stood on the line between the farm of B. T. Mulford and the Isaac Mulford farm, and to where that fence formerly stood. It had been moved to the west about one rod in its widest place, about the middle of the line. The removal at the beginning and end of the line was less than one rod.

Deeds and papers marked *Exhibits No.* 2, *No.* 3, *No.* 4, *No.* 5, *No.* 6, *No.* 7, are presented on part of complainant, and made Exhibits in this cause.

*Hugh R. Merseilles,* of Bridgeton, a witness produced on the part of complainant, being duly sworn according to law, on his oath says: That he is Surrogate of the county of Cumberland, and being shown papers marked *Exhibit* 8, 9, 10 and 11, says they are respectively true copies from papers on file and of record in said Surrogate's office.

*Jeremiah H. Lupton,* of Bridgeton, a witness produced on the part of complainant, being duly sworn according to law, on his oath says: that I am acquainted with the handwriting of Jonathan Bowen; I have seen him write, and have papers in my possession written by him; and being shown *Exhibit No.* 12, says I am satisfied that is in the handwriting of Jonathan Bowen.

The cause was argued in the Court of Chancery by *A. Browning* and *P. D. Vroom* for the complainant, who cited *Sug. on Vendors,* 391, 2, 3; 3 *Bro. Ch.* 120; 8. *Ves. Jun.* 345; *Roberts on Frauds,* 78 *to* 129; 14 *John. Rep.* 179; 6 *Ib.* 385; 3 *Harr. Rep.* 73; 2 *Story's Eq. Jur.* sec. 799b, 1235, 1237 note 4; *White's Eq. Cases,* 140, 2, 4; 1 *Gilman,* 615; 5 *John. Rep.* 43; *John Ch.* 43; 7 *Pick,* 1; 6 *Halst. Rep.* 44.

And by *T. H. Dudley* and *L. Q. C. Elmer* for the defendants, who cited 6 *Halst. Rep.* 392; 3 *Harr. Rep.* 73; *White's leading cases in Equity, in Law Lib.* 144; 3 *Gill and John.* 164; 1 *Jac. and Walk.* 204, 265, note; 1 *Story's Eq. Jur.* sec. 522; *Ib.* sec. 61, 2, 64; 3 *Eden's Rep.* 280; 14 *Ves. J.* 91; 3 *Bro. Ch.* 6,333 4 *John. Rep.* 536; 1 *John. Ch.* 482.

The Chancellor dissolved the injunction.

The order of dissolution was appealed from.

The cause was argued in this Court by *Browning* and *P. D. Vroom* for the appellant,

And by *T. H. Dudley* and *J. T. Nixon* for the respondents.

The order dissolving the injunction, was unanimously Reversed.